UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RONALD C. GREENLAND,

                              Petitioner,

         v.                                                    No. 20-CV-8303 (KMK)

UNITED STATES OF AMERICA,

                              Respondent.


UNITED STATES OF AMERICA,

         v.

                                                              No. 17-CR-65 (KMK)
RONALD C. GREENLAND,
                                                              OPINION & ORDER
                              Defendant.


Appearances:

Ronald C. Greenland
Attica Correctional Facility
Attica, NY
*Pro Se Petitioner*

Olga Zverovich, Esq.
United States Attorney's Office
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, United States District Judge:

         Ronald Greenland ("Greenland" or "Petitioner"), proceeding pro se, has filed a Petition

for a Writ of Habeas Corpus (the "Petition"), pursuant to 28 U.S.C. § 2255, to vacate, set aside,

or correct his conviction for illegal reentry, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). (*See

generally* Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. No. 1, Dkt. No. 20-CV-8303; Dkt.

No. 33, Dkt. No. 17-CR-65); Supp. Pet. for Writ of Habeas Corpus ("Supp. Pet.") (Dkt. No. 14, Dkt. No. 20-CV-8303; Dkt. No. 40, Dkt. No. 17-CR-65).)[1]  In the Petition and Supplemental Petition, Petitioner raises numerous arguments as to why his conviction should be vacated.  For the foregoing reasons, both Petitions are denied.

## I. Background

### A. Factual Background

#### 1. Petitioner's First Illegal Reentry

Petitioner, a native and citizen of Jamaica, "is not and has never been a citizen of the United States."  (Pre-Sentence Report ("PSR") ¶ 7 (Dkt. No. 23, Dkt. No. 17-CR-65).) Petitioner was born in Jamaica on February 4, 1963, (*id.* ¶ 49), and became a permanent resident of the United States in 1972, a legal status later removed by an immigration judge due to Petitioner's aggravated felony convictions, (*id.* ¶ 7.)

On June 11, 1987, Petitioner was convicted upon a plea of guilty in Westchester County Court in White Plains, New York, of arson in the third degree, which qualifies as an "aggravated felony" under 8 U.S.C. § 1326(b)(2), and was sentenced to one to three years' imprisonment. (*Id.* ¶ 8.)  On October 14, 2004, Petitioner was again convicted in Westchester County Court of approximately 22 criminal offenses, including larceny in the third degree.  (*Id.* ¶ 9.)  A few months later, Petitioner "was sentenced to an indeterminate term of two to six years' imprisonment on each of the four separate counts" of larceny.  (*Id.*)

On February 23, 2007, after an immigration judge ordered Petitioner removed from the United States, Petitioner was removed to Jamaica on February 26, 2009.  (*Id.* ¶¶ 10–11.)  That

---

[1] Certain of the papers cited herein were filed on Petitioner's criminal docket, Case No. 17-CR-65, and certain on Petitioner's civil docket, Case No. 20-CV-8303.  The docket citations indicate on which docket each document was filed.

same year, "in approximately August or September 2009," Petitioner illegally reentered the

United States and, on November 25, 2009, was subsequently arrested by state authorities for

criminal possession of stolen property in the fifth degree.  (*Id.* ¶¶ 38–39.)  On May 19, 2010,

Petitioner was convicted of this count in Nassau County Court and sentenced to one year

imprisonment.  (*Id.* ¶ 39.)

On August 19, 2010, Petitioner was arrested by Immigration and Customs Enforcement

("ICE") agents and charged with illegally reentering the United States following removal

subsequent to a conviction for an aggravated felony, in violation of §§ 1326(a) and (b)(2)

("aggravated illegal reentry").  (*Id.*)  In April 2011, Petitioner pled guilty to this charge before

Judge Kimba M. Wood and was sentenced to 60 months' imprisonment and three years'

supervised release.  (*Id.* ¶¶ 12, 39.)  Petitioner's conviction was affirmed on appeal, *United

States v. Greenland*, 471 F. App'x 74 (2d Cir. 2012) (summary order), and Judge Wood later

denied Petitioner's § 2255 petition, *Greenland v. United States*, No. 10-CR-742, 2013 WL

6049075 (S.D.N.Y. Nov. 15, 2013).

On April 30, 2015, Petitioner was again lawfully removed from the United States to

Jamaica.  (PSR ¶ 13.)

### 2. Petitioner's Second Illegal Reentry

Following his second removal, Petitioner again illegally reentered the United States.  (*Id.*

¶¶ 14–15.)  On November 8, 2016, Petitioner was arrested by state authorities in the town of

Bedford, New York, on several charges, including the attempted murder of a police officer.  (*Id.*

¶¶ 15, 40.)  On December 9, 2016, while in state custody, Petitioner was arrested by ICE for

aggravated illegal entry, (*id.* ¶ 16), the offense that forms the basis of this Petition.  On January

3, 2017—before the resolution of Petitioner's state case—the Government provided Petitioner's

attorney with a letter, consistent with *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir.

3

1991), outlining the Government's position that Petitioner's Sentencing Guidelines (the "Guidelines") range was 57 to 71 months' imprisonment (the "Initial *Pimentel* Letter").  (*See* Pet. 13 (Ex. A); *see* Gov't Opp. to Pet. ("Gov't Opp.") 5–6 (Dkt. No. 10, Dkt. No. 20-CV-8303).)

Later that month, on January 30, 2017, Petitioner appeared before Magistrate Judge Paul Davison, waived indictment, and consented to a one-count criminal Information charging Petitioner with aggravated illegal reentry.  (*See* Dkt. Nos. 6–7, Dkt. No. 17-CR-65.)  Petitioner later sought and received adjournments for his pretrial conference until the resolution of his state case.  (*See* Dkt. Nos. 10, 12–14, Dkt. No. 17-CR-65.)

On October 25, 2017, following a jury trial, Petitioner was convicted of attempted murder in the first degree, attempted assault in the first degree, attempted aggravated assault in the second degree, criminal possession of a weapon in the third degree, and criminal possession of stolen property in the fifth degree.  (PSR ¶¶ 15, 40.)  On November 7, 2017, the Government provided Petitioner's attorney with a revised *Pimentel* letter (the "Revised *Pimentel* Letter"). (*Id.* ¶ 4; *see* Gov't Opp. to Supp. Pet. ("Gov't Supp. Opp.") Ex. B ("Rev. *Pimentel* Ltr.") (Dkt. No. 20-2, Dkt. No. 20-CV-8303).)  The Revised Letter, which incorporated the October 2017 state conviction into Petitioner's Guidelines calculations, outlined the Government's position that Petitioner's revised range was 84 to 105 months' imprisonment.  (Rev. *Pimentel* Ltr. 7; PSR ¶ 4.)  In the Revised *Pimentel* Letter, the Government advised that if Petitioner was sentenced to at least five years for his October 2017 state conviction, his Guidelines range would increase to 151 to 188 months' imprisonment.  (Rev. *Pimentel* Ltr. 7 n.4; *see also* PSR ¶ 4 & nn.1–2.)

### 3. Petitioner's Guilty Plea

On November 21, 2017, in front of Magistrate Judge Lisa Margaret Smith, Petitioner pled guilty to the charge in the Information without the benefit of a plea agreement.  (Plea Tr. (Dkt.

No. 10-1, Dkt. No. 20-CV-8303).)  After placing Petitioner under oath, Judge Smith completed a full plea allocution and confirmed, inter alia, that Petitioner was competent to plead guilty, was not being treated for mental illness or substance abuse, had not consumed any substance before the proceeding that affected his ability to think, and had entered into the plea freely and voluntarily after consultation with his attorney.  (*See id.* 5:6–9:7.)

Judge Smith also advised Petitioner of the potential consequences of conviction following his guilty plea, including the possible sentences that could be imposed, (*id.* 10:21–13:3), and confirmed that Petitioner understood that the calculated Guidelines range laid out in the Revised *Pimentel* Letter was not binding on the Court, (*id.* 13:20–17:2).  Judge Smith further explained that while the Revised *Pimentel* Letter calculated Petitioner's Guidelines range as 84 to 105 months, "[i]f [Petitioner was] sentenced to at least five years on [his] Westchester County conviction, [his] guidelines level . . . would increase to a range of 151 to 188 months of imprisonment."  (*Id.* 14:16–15:2.)  Petitioner also confirmed his understanding that he could not withdraw his guilty plea even if he disagreed with the sentence handed down by the Court.  (*Id.* 18:10–14.)  Petitioner then pled guilty to aggravated illegal reentry, confirming, among other things, that no one had "threatened [him] or coerced [him] or pressured [him] improperly[] in order to get [him] to plead guilty to this charge," (*id.* 24:23–25:12), and allocated to his offense conduct, (*id.* 25:13–29:3).

Near the end of the hearing, in response to Judge Smith's inquiry if it was "still [Petitioner's] wish to plead guilty to the charge of illegal re-entry," Petitioner said "No," and stated: "I just think there's a lot more going on . . . ."  (*Id.* 33:16–23.)  After the Court informed him he did not "have to plead guilty," Petitioner stated twice: "I don't have a choice.  I'm pleading guilty."  (*Id.* 34:1–6.)  Petitioner's attorney advised him "[w]e have a choice" and "can

try the case." (*Id.* 34:7–9.) The Court then noted that Petitioner "seem[ed] to be not confident of [his] decision" and asked if he wanted "a delay in these proceedings to be able to think about it further," which Petitioner declined. (*Id.* 34:11–17.) When the Court then asked Peitioner: "What do you want to do? Do you want to plead guilty, or plead not guilty?", Petitioner responded: "I'm pleading guilty." (*Id.* 34:18–20.) The Court confirmed one last time if Petitioner was "sure that that's the decision [he] wish[ed] to make," to which Petitioner stated "yes." (*Id.* 34:21–23.)

Following this colloquy, Judge Smith found that Petitioner was "fully competent and capable of entering an informed plea" that was "knowing and voluntary, and [was] supported by an independent factual basis for each and every element of the crime charged." (*Id.* 34:24–35:3.) Judge Smith thus recommended that the Court accept Petitioner's guilty plea, (*id.* 35:4–7), which it did on December 12, 2017, (Dkt. No. 22, Dkt. No 17-CR-65).

### 4. Petitioner's Sentencing

On February 27, 2018, Petitioner received a sentence of 40 years' to life imprisonment on his October 2017 state conviction. (*See* Sentencing Tr. 12:2–18 (Dkt. No. 28, Dkt. No. 17-CR-65); PSR ¶ 99; PSR at 24.) Two days later, the U.S. Probation office issued the final PSR in this case, calculating Petitioner's Guidelines range as 151 to 188 months' imprisonment. (*See* PSR ¶¶ 20–32, 35–43, 98.) Petitioner did not object to the PSR. (*Id.* at 23.)

On March 27, 2018, Petitioner was sentenced by this Court, which determined that the Guidelines range was 151 to 188 months' imprisonment, as reflected in the PSR. (Sentencing Tr. 21:1–23:5.) After hearing argument from the Parties and a statement by Petitioner, the Court analyzed the 18 U.S.C. § 3553(a) factors, beginning with "the need to impose a sentence that promotes respect for the law, provides for just punishment and accounts for the seriousness of the criminal conduct." (*Id.* 24:14–18.) Specifically, the Court noted that "if there was ever a

need for a sentence that promotes respect for the law, I think this is it, because the record here is one of disrespect for the law," which "are substantial factors in tipping the scales towards a higher sentence." (*Id.* 24:17–25:2.) The Court then analyzed the remaining § 3553(a) factors, including general and specific deterrence and the need to avoid unwarranted sentencing disparities, before concluding that—"taking all the [§] 3553(a) factors into account"—the Guidelines range here was "appropriate." (*Id.* 25:3–26:13.) The Court then determined that the last 100 months of the sentence should run consecutively to Petitioner's state sentence, noting that a concurrent sentence would instead render the federal sentence "completely irrelevant," and that the federal "sentence should be relevant because this crime is separate from the crime that [Petitioner] was convicted of in State Court." (*Id.* 26:13–27:3.) Accordingly, Petitioner was sentenced to 151 months' imprisonment followed by three years of supervised release. (*Id.* 27:10–13.) Judgment was entered on June 4, 2018. (Dkt. No. 26, Dkt. 17-CR-65.)

5. Post-Conviction Proceedings

Petitioner appealed his sentence, raising two challenges: (1) that his sentence was substantively unreasonable, as if he were found in the United States only a few days prior, the previous version of the Guidelines would have applied, with a range of 77 to 96 months, (*see* Brief for Defendant Appellant Ronald Greenland ("Pet. Appeal Br.") 25–35, No. 18-1761-CR (Dkt. No. 10-2, Dkt. No. 20-CV-8303)); and (2) that the Court erred by imposing a partially consecutive sentence, (*id.* at 35–38). The Second Circuit affirmed Petitioner's judgment of conviction in February 2019 through summary order. *See United States v. Greenland*, 790 F. App'x 234, 236 (2d Cir. 2019).

B.  Procedural History

Petitioner filed the instant Petition on October 5, 2020, seeking to vacate his sentence. (*See* Pet.)  On January 19, 2021, the Government filed its Opposition to the Petition.  (Gov't Opp.)

Petitioner later sought and received permission to file a Supplemental Petition, which he submitted on April 1, 2021.  (Dkt. Nos. 11–13, Dkt. No. 20-CV-8303; *see* Supp. Pet.)  The Government filed an Opposition to the Supplemental Petition on May 17, 2021.  (*See* Gov't Supp. Opp.)

II.  Discussion

A.  Standard of Review

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).[2]  "Because collateral challenges are in 'tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'"  *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak v. United States*, 59

---

[2] 28 U.S.C. § 2255(a) provides, in full:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

F.3d 296, 301 (2d Cir. 1995)).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quotation marks omitted); *accord Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez v. United States*, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), *aff'd*, 679 F. App'x 41 (2d Cir. 2017).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  Moreover, a hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible."  *Machibroda v. United States*, 368 U.S. 487, 495 (1962).  To justify a hearing, the petition "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief."  *See Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013).  Finally, because Petitioner is appearing pro se, the Court construes the Petition and his other submissions "liberally and interpret[s] [the] to raise the strongest arguments that they *suggest*."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (italics and citation omitted)).

B.  Analysis

Petitioner raises multiple challenges to his conviction and sentence, primarily arguing that: (1) he is not an alien subject to removal, but instead a naturalized or derived citizen, (Pet. 4–5; Supp. Pet. 2); (2) his arson conviction did not constitute an "aggravated felony," (Pet. 5–6); (3) in sentencing, the Court improperly overlooked the time Petitioner spent in state custody, (*id.*

9

at 6–7); (4) the Court improperly applied three criminal history points for Petitioner's October

2017 state convictions, (*id.* at 7); (5) his sentence was unreasonable because the Court failed to

take into account sentencing disparities, double counted his state conviction, and imposed a

partially consecutive sentence, (*id.* at 7–8); (6) the Court improperly applied the Guidelines in

effect when Petitioner was arrested for illegal reentry, not the Guidelines in effect when he

actually reentered the country, (*id.* at 8–9); (7) he was pressured or coerced into pleading guilty,

(*id.* at 9–10; Supp. Pet. 7–8); and (8) he received ineffective assistance of counsel, (Pet. 10–11;

Supp. Pet. 20–30).  The Court addresses each ground for relief in turn.

      1.  <u>Alien Status</u>

First, Petitioner argues that his conviction was in error, as he is "not an alien" subject to

removal, but instead was naturalized through his "registration, enlistment and participation in

Selective Services[, which] satisfies the requirements that [he] previously took steps to formally

declare [his] allegiances to the United States."  (Pet. 4–5; *see also* Supp. Pet. 2.)  Alternatively,

Petitioner argues that he acquired "derivative citizenship" through his mother, Dorrell

Greenland.  (Pet. 4–5; *see also* Supp. Pet. 2–3.)  Both arguments fail.

An "alien," as relevant here, is defined as "any person not a citizen or national of the

United States."  8 U.S.C. § 1101(a)(3).  The term "national" is defined as either "a citizen of the

United States" or "a person who, though not a citizen of the United States, owes permanent

allegiance to the United States."  8 U.S.C. §§ 1101(a)(22)(A) & (B).  In reviewing a petition

presenting a similar argument to the one raised here, the Second Circuit clarified that

§ 1101(a)(22)(B) was "designed to describe the attributes of a person who has already been

deemed a non-citizen natural . . ., rather than to establish a means by which one may obtain that

status."  *Marquez-Almanzar v. I.N.S.*, 418 F.3d 210, 217 (2d Cir. 2005).  In other words, the

language "'permanent allegiance' merely describes the nature of the relationship between non-citizen nationals and the United States," rather than creates an alternative path to naturalization. *Id.* In so holding, the Second Circuit rejected the petitioner's argument that, inter alia, his "enrollment and service in the U.S. Army . . . [and] registration for the Selective Service" naturalized him, and held unequivocally that "one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation of 'permanent allegiance' to the United States." *Id.* at 216, 218–19; *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570, 2017 WL 2671083, at *2 (S.D.N.Y. June 21, 2017) ("The Second Circuit law is clear: one cannot 'qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation of 'permanent allegiance' to the United States." (quoting *Marquez-Almanzar v. I.N.S.*, 418 F.3d 210, 218–19 (2d Cir. 2005))), *aff'd sub nom. Hoglan v. Rafsanjani*, 759 F. App'x 99 (2d Cir. 2019) (summary order); *Flores v. Quarantillo*, No. 07-CV-3983, 2008 WL 5396599, at *5 (S.D.N.Y. Dec. 29, 2008) ("[T]he Second Circuit has explained that one cannot qualify for U.S. national status through a demonstration of permanent allegiance.").

 *Marquez-Almanzar* controls here. Petitioner bases his naturalization argument solely on his registration in the Selective Service, an argument squarely rejected by the Second Circuit, *Marquez-Almanzar*, 418 F.3d at 216, and admits that "no application for naturalization was ever made by [him]," (Pet. 4; *see also* Supp. Pet. 3). Accordingly, the Court concludes that Petitioner is an "alien," not a U.S. national, and cannot challenge his conviction on this basis. *See Hoglan*, 759 F. App'x at 105 (affirming the district court's ruling that plaintiffs-appellants "could not have become nationals of the United States, as defined in 8 U.S.C. § 1101(a)(22), by manifesting permanent allegiance to the United States through their efforts to become citizens"); *cf. Martinez-Rodriguez v. U.S. Dep't of Homeland Sec.,* No. 06-CV-10220, 2009 WL 3241533,

at *4 (S.D.N.Y. Oct. 5, 2009) (rejecting a plaintiff's request for a declaratory judgment that he

was a U.S. national because "one cannot qualify as a ['non-citizen national'] by a manifestation

of 'permanent allegiance' to the United States" (quoting *Marquez-Almanzar*, 418 F.3d at 218–

19)).[3]

    Petitioner's derivative citizenship argument is similarly unavailing. Petitioner claims that

he acquired derivative citizenship pursuant to 8 U.S.C. § 1432 because his mother "appl[ied] for

United States Citizenship on April 1979," before Petitioner turned 17, and "acquired

Nationalization on January 1982," before Petitioner turned 21. (Pet. 4–5; *see also* Supp. Pet. 2–

3.) However, the version of the Immigration and Nationality Act ("INA") that applied when

Petitioner's mother became naturalized in January 1982, provides that "[a] child born outside of

the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of"

certain conditions, including, as relevant here, that a parent's "naturalization takes place while

such child is under the age of eighteen years." 8 U.S.C. § 1432(a), *repealed by* Child Citizenship

Act of 2000, Pub. L. 106–395, § 103, 114 Stat. 1631, 1632 (2000); *see Lewis v. Gonzales*, 481

F.3d 125, 126 & n.1 (2d Cir. 2007) (per curiam) (determining that § 1432(a)(3) applied, even

though it was repealed in 2000, "because it was 'in effect when [the plaintiff] [allegedly] fulfilled

the last requirement for derivative citizenship'" (quoting *Ashton v. Gonzales*, 431 F.3d 95, 97 (2d

---

[3] The cases Petitioner cites do not change the analysis. (*See* Pet. 4; Supp. Pet. 2–3.) The first, *Lee v. Ashcroft*, 216 F. Supp. 2d 51 (E.D.N.Y. 2002), was partially reversed on appeal based on *Marquez-Almanzar*'s holding. *See Lee v. Ashcroft*, 142 F. App'x 503, 504 (2d Cir. 2005) (summary order) (rejecting the argument "relied on by the district court in granting [Lee's] petition, that an individual can become a noncitizen national under 8 U.S.C. § 1101(a)(22)(B) by demonstrating permanent allegiance to the United States"). The second, *Lee v. United States*, No. 05-CV-5844, 2007 WL 1987868 (S.D.N.Y. July 9, 2007), *report and recommendation*, does not address § 1101(a)(22)(B) and is thus inapposite. *See generally id.* The third, *United States v. Morin*, 80 F.3d 124 (4th Cir. 1996), was decided before *Marquez-Almanzar* and, in any event, is out of Circuit and thus not binding on this Court.

Cir. 2005))).  By his own account, Petitioner was under 18 when his mother *applied* for

naturalization but over 18 years old when she was actually naturalized.  Accordingly, per the

plain language of the statute, Petitioner is ineligible for derivative citizenship and was properly

deemed an "alien" subject to removal.[4]  *See Walcott v. Holder*, 592 F. App'x 25, 27 (2d Cir.

2015) (summary order) ("Since [appellant's] mother did not naturalize before he was 18 years

old, [appellant] fails to satisfy the conditions in Section 1432(a) that would entitle him to

derivative citizenship."); *Anderson v. Holder*, 382 F. App'x 16, 17 (2d Cir. 2010) (summary

order) ("Anderson did not derive U.S. citizenship through his mother's naturalization because he

was not 'under the age of eighteen years' at the time she was naturalized." (quoting 8 U.S.C.

§ 1432(a))); *cf. Henry v. Quarantillo*, 684 F. Supp. 2d 298, 313 (E.D.N.Y. 2010) (denying a

derivative citizenship claim because plaintiff could not demonstrate he met the statutory

requirements "before his eighteenth birthday"), *aff'd*, 414 F. App'x 363 (2d Cir. 2011).[5]

## 2. Definition of Aggravated Felony

Next, Petitioner argues that his 1987 arson conviction was not an "aggravated felony"

under the [U.S.S.G. § 2L1.2] and thus, the District Court incorrectly enhanced Petitioner's base

offense level by sixteen levels.  (*See* Pet. 5–6.)  As the Government notes, (*see* Gov't Opp. 18),

---

[4] As the Government points out, (*see* Gov't Opp. 15), this argument also contradicts Petitioner's sworn testimony at his plea hearing, (*see* Plea Tr. 25:15–16 ("I'm a citizen of Jamaica, and I re-entered the country without permission from the government."); *id.* 28:24–29:2 (conceding "that there is no record of [Petitioner's] ever becoming or even applying for citizenship, whether on [his] own or as a child of [his] parents")), as well as his statements to Probation, (PSR ¶ 55), and the Court, (Gov't Opp. Ex. D at 4 (Dkt. No. 10-4, Dkt. No. 20-CV-8303)).

[5] Petitioner also nominally asserts an equal protection claim based on his denial of derivative citizenship but does not explain why the application of § 1432(a) to his case constitutes a violation of the equal protection clause.  (*See* Supp. Pet. 4–5.)  *Cf. Pierre v. Holder*, 738 F.3d 39, 51 (2d Cir. 2013) (rejecting an equal protection challenge to § 1432(a)(3) because "§ 1432(a) does not discriminate on the basis of a protected class").

Petitioner's arson conviction was not actually part of his Guidelines calculation, (*see* PSR

¶¶ 20–32 (not including arson conviction in calculation); *see* Sentencing Tr. 21:1–23:5 (same)).

To the extent, however, that Petitioner's argument can be construed as contending that his

removal was not "subsequent to a conviction for commission of an aggravated felony" per

8 U.S.C. § 1326(b)(2), that claim must also fail.

    The term "aggravated felony" is defined in the INA as a variety of possible offenses,

including, as relevant here, "an offense described in" § 844(i), which "relat[es] to explosive

material offenses." 8 U.S.C. § 1101(a)(43)(E)(i).[6] Petitioner's New York state conviction for

arson in the third degree thus qualifies as an aggravated felony under the INA. *See Torres v.*

*Lynch*, 578 U.S. 452, 473 (2016) (holding that a conviction for arson under New York penal law

is analogous to 18 U.S.C. § 844(i) and thus, is an "aggravated felony" for the purposes of

§ 1101(a)(43)); *see also Smith v. Garland*, No. 21-6278, 2023 WL 7147426, at *1 (2d Cir. Oct.

31, 2023) ("In determining whether a conviction is for an 'aggravated felony,' we apply the

'categorical approach,' considering only whether the generic elements of the state offense (rather

than the defendant's specific offense conduct) are comparable to an 'aggravated felony' listed in

8 U.S.C. § 1101(a)(43)." (citing first *United States v. Beardsley*, 691 F.3d 252, 259 (2d Cir.

2012) then *Moncreiffe v. Holder*, 569 U.S. 184, 190–92 (2013))).

---

[6] Specifically, § 844(i) provides that:

    Whoever maliciously damages or destroys, or attempts to damage or destroy, by
    means of fire or an explosive, any building, vehicle, or other real or personal
    property used in interstate or foreign commerce or in any activity affecting
    interstate or foreign commerce shall be imprisoned for not less than 5 years and not
    more than 20 years, fined under this title, or both . . . .

18 U.S.C. § 844(i).

Petitioner's arguments do not change the outcome.  First, he argues his arson conviction cannot qualify as an aggravated felony "because it lacks the jurisdictional element of § 844(i)[,] which the Supreme Court has found to be [a] critical and substantive element of the arson offense."  (Pet. 6.)  But the Supreme Court rejected this same argument in *Torres*, noting that "New York arson law differs from [§844(i)]" only in that it "lacks an interstate commerce element," but holding that "such an element is properly ignored when determining if a state offense counts as an aggravated felony under § 1101(a)(43)."  578 U.S. at 473; *see also Awawda v. Barr*, 813 F. App'x 29, 32 (2d Cir. 2020) (summary order) ("A state offense is an aggravated felony 'described in' a federal statute if it contains every element of the federal statute other than jurisdictional elements, such as elements requiring a connection to interstate or foreign commerce.").

Second, Petitioner argues that his 1987 arson conviction cannot be an aggravated felony because his conviction predated the definition of "aggravated felony" enacted in the Anti-Drug Abuse Act ("ADAA") of 1988, and thus, he would only be subject "to deportation as an aggravated felon [only if] convicted after November 1, 1988."  (*See* Pet. 5–6 (emphasis removed).)  However, the Second Circuit has already addressed this same argument and concluded that "aliens convicted of an aggravated felony are subject to removal even if their convictions predated the enactment of the ADAA."  *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004) (citing *Kuhali v. Reno*, 266 F.3d 93, 111 (2d Cir. 2001)).  Accordingly, Petitioner was properly subject to removal "even though his aggravated felony conviction predates the enactment of the ADAA."  *Id.* at 500; *see also Simmonds v. Lynch*, 649 F. App'x 44, 45 (2d Cir.

15

2016) (summary order) ("[R]emoval for an aggravated felony based on a pre-1988 conviction is permissible if the notice of deportation proceeding is given after March 1, 1991.").[7]

### 3. Time Spent in State Custody

Next, Petitioner argues that the Court erred by failing to consider the time Petitioner served in state custody pretrial. (*See* Pet. 6–7.) In opposition, the Government contends that first, this claim is procedurally defaulted because it was not raised on direct appeal, and second, that the Court did, in fact, consider Petitioner's state sentence. (*See* Gov't Opp. 20.) The Government is correct.

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *Ortiz-Correa v. United States*, No. 17-CR-737, 2023 WL 2504731, at *4 (S.D.N.Y. Mar. 14, 2023) (quoting *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011)). "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." *Thorn*, 659 F.3d at 231; *see also Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" (citations omitted)).

Petitioner did not raise this argument on appeal, (*see generally* Pet. Appeal Br.), and does not argue that he is "actually innocent" of the charged crime, (*see generally* Pet.; *see generally*

---

[7] Indeed, Judge Wood also rejected this same argument in deciding Petitioner's § 2255 petition for his first aggravated illegal entry conviction. *See Greenland v. United States*, No. 10-CR-742, 2013 WL 6049075, at *3 (S.D.N.Y. Nov. 15, 2013) ("[A]n alien is subject to deportation as a result of an aggravated felony conviction 'notwithstanding that the alien had been convicted of [the] aggravated felony prior to the enactment of the [ADAA] . . . .'" (quoting *Gelman*, 372 F.3d at 496)).

16

Supp. Pet.).  Moreover, he has not demonstrated—let alone argued—cause or prejudice as to

why he did not raise this argument on appeal.  (*See generally* Pet.; *see generally* Supp. Pet.)

Accordingly, this claim is procedurally defaulted.  *See Gomez Ortiz v. United States*, No. 19-CR-

536, 2025 WL 1580922, at *5 (S.D.N.Y. June 4, 2025) (dismissing a § 2255 petition where the

petitioner's "claims could have been raised on direct appeal and, therefore, are procedurally

barred because [petitioner] ha[d] failed to demonstrate cause for failure to raise the issues on

direct appeal or made a claim of actual innocence"); *United States v. Tucker*, No. 16-CR-91,

2024 WL 3983410, at *14–15 (S.D.N.Y. Aug. 29, 2024) (determining a claim was procedurally

defaulted when it "was not first raised in a direct appeal" and where petitioner could not

demonstrate cause or prejudice).

However, even were it not barred, this claim must fail.  The Court ordered that 51 months

of Petitioner's federal sentence run concurrently with the state sentence, which, in turn,

incorporated Petitioner's time in pretrial custody.  (*See* Sentencing Tr. 27:18–20.)  *See also* New

York Penal Law § 70.30(3) (providing that a sentencing term "shall be credited with and

diminished by the amount of time" spent in pretrial custody); *see also Robinson v. Connell*, No.

05-CV-1428, 2010 WL 6268444, at *9 (N.D.N.Y. Sept. 8, 2010) ("Under the New York Penal

Law, when two sentences run 'concurrently,' 'the time served under imprisonment on any of the

sentences shall be credited against the *minimum periods* of all the concurrent indeterminate

sentences.'" (quoting N.Y. Penal Law § 70.30(1)(a)), *report and recommendation adopted*, No.

05-CV-1428, 2011 WL 1103771 (N.D.N.Y. Mar. 23, 2011), *aff'd*, 478 F. App'x 705 (2d Cir.

2012).  Accordingly, the Court necessarily took into account the state sentence—including the

time Petitioner spent in pretrial—in imposing the concurrent sentence and thus, there was no

error.  *Cf. Jackson v. Killian*, No. 08-CV-4386, 2009 WL 1835004, at *3 (S.D.N.Y. June 23,

2009) ("A federal sentence can run concurrently to a state sentence if a portion of the state sentence remains undischarged when the federal sentence is imposed." (citing *Fermin v. United States*, 252 F.3d 102, 109 (2d Cir. 2001))).

### 4.  Criminal History Category Enhancements

Petitioner next asserts that he incorrectly received three criminal history points for his October 2017 state conviction as "he had not yet been sentenced" when apprehended by ICE and thus, the enhancement should not have applied.  (*See* Pet. 7.)  Again, as Petitioner did not raise this argument on direct appeal, (*see generally* Pet. Appeal Br.), and does not demonstrate either cause or prejudice, this claim is also procedurally defaulted, *see Gomez Ortiz*, 2025 WL 1580922, at *5; *Tucker*, 2024 WL 3983410, at *14–15.

In any event, however, this argument is without merit.  Under § 4A1.1 of the Guidelines, which "governs the calculation of a defendant's criminal history category[,] . . . [a] defendant's prior sentences are also relevant to determining his base offense level . . . ."  *United States v. Banks*, 776 F.3d 87, 90 (2d Cir. 2015).  "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense."  *Id.* (quoting U.S.S.G. § 4A1.2(a)(1) (emphasis omitted)); *see also United States v. Wynn*, No. 22-CR-2721, 2024 WL 1152536, at *1 (2d Cir. Mar. 18, 2024) (summary order) (same).  It makes no difference that Petitioner had not yet been sentenced on his October 2017 state conviction when he was charged with the instant offense of aggravated illegal reentry, because the state charge was "for conduct other than conduct that was part of the instant offense" and thus qualified as a prior offense under the

Guidelines.  U.S.S.G. § 4A1.2(a)(1).  Accordingly, Petitioner was properly assessed three criminal history points for his state offense.[8]

     5.  <u>Sentencing Errors</u>

Petitioner next contends that the Court erred by not considering sentencing disparities between Petitioner and other defendants charged with illegal reentry (i.e., defendants eligible for the SDNY Fast-Track Policy for Felony Illegal Reentry Offenses (the "fast-track" policy)),[9] by "double-counting" Petitioner's prior offenses, and by imposing a disproportionately high consecutive 151-month sentence, "in conjunction" with "Petitioner['s] already excessive life sentence."  (*See* Pet. 7–8; *see also* Supp. Pet. 15–17.)  The Government asserts that these arguments are procedurally defaulted, blocked by the mandate rule or, in any event, are without merit.  (*See* Gov't Opp. 22–25.)

The Court agrees that, as an initial matter, these challenges are all procedurally barred. Petitioner did not raise a fast-track sentencing disparity challenge on appeal or challenge what he now contends is "double-counting."  (*See generally* Pet. Appeal Br.)  Because he does not show cause or prejudice for his failure to raise these arguments, they are procedurally defaulted. *Tucker*, 2024 WL 3983410, at *14–15.

Moreover, Petitioner's challenge to the consecutive aspect of his sentence is barred by the mandate rule, which prevents "re-litigation of issues already decided on direct appeal."  *United*

---

[8] In support of this argument, Petitioner cites only to an Eleventh Circuit case, *United States v. Scott*, 447 F.3d 1365 (11th Cir. 2006), which concerned an earlier version of the Guidelines no longer in effect during Petitioner's case and is thus inapposite.

[9] "A 'fast-track' program is an early disposition program authorized by the Attorney General of the United States that 'allows a defendant charged with illegal reentry to plead to a reduced sentence or to a lesser offense (such as entering the United States without inspection).'" *Greenland*, 471 F. App'x at 75 (quoting *United States v. Mejia*, 461 F.3d 158, 159 (2d Cir. 2006)).

*States v. Key*, No. 12-CR-712, 2025 WL 1212153, at *4 (S.D.N.Y. Apr. 24, 2025) (citing *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010)); *see also United States v. Tyrell*, No. 15-CR-95-05, 2025 WL 1029931, at *3 (S.D.N.Y. Apr. 7, 2025) (rejecting claims raised on a § 2255 petition that were already raised and considered on direct appeal). Here, there is no dispute that Petitioner raised this argument on appeal, (*see* Pet. Appeal Br. 35–38), and that said argument was rejected by the Second Circuit, *see Greenland*, 790 F. App'x at 237 (concluding the Court did not abuse its discretion by being "primarily concerned with ensuring the federal sentence remained relevant" and imposing a partially consecutive sentence). Accordingly, this argument is blocked by the mandate rule. *See Calonge v. United States*, No. 20-CR-523, 2025 WL 2144689, at *9 (S.D.N.Y. July 29, 2025) (concluding the mandate rule barred claims raised in a § 2255 that were already raised on direct appeal).

Regardless, Petitioner's arguments fail on the merits. First, contrary to Petitioner's assertion, (*see* Pet. 8), the Court did explicitly consider the need to avoid unwarranted sentencing disparities during its § 3553(a) analysis, (*see* Sentencing Tr. 25:20–26:9).[10] Moreover, "a district court's refusal to adjust a sentence to compensate for the absence of a fast-track program does not make a sentence unreasonable," *Greenland*, 471 F. App'x at 76 (quoting *Mejia*, 461 F.3d at 164), and the Court was not required to explicitly cite any potential fast-track disparities in conducting its § 3553(a) analysis, *United States v. Keitt*, 21 F.4th 67, 72 (2d Cir. 2021) ("We have never required a district court to 'address every argument the defendant has made or discuss every § 3553(a) factor individually.'" (quoting *United States v. Rosa*, 957 F.3d 113, 119 (2d Cir. 2020))); *see also United States v. Khan*, No. 18-CR-830, 2023 WL 2911021, at *2 n.5 (S.D.N.Y.

---

[10] Although the Court did not discuss any disparities created by the fast-track policy, such discussion appears to have not been warranted, as the Government represents that Petitioner was never eligible for said policy. (*See* Gov't Opp. 23.)

Apr. 11, 2023) ("In conducting the § 3553(a) analysis, '[a] district court is not required to discuss every § 3553(a) factor individually or to make robotic incantations in sentencing decisions." (quoting *United States v. Cabassa*, No. 19-3874-cr, 2021 WL 28150, at *2 (2d Cir. Jan 5, 2021) (summary order))). [11]

Second, Petitioner is incorrect that his prior convictions were "double counted" by enhancing both his criminal history category and his offense level, (*see* Pet. 8), as "[i]t is well-established in this Circuit that a district court does not err when it uses a prior offense to calculate both the offense level and the criminal history category to determine the correct Guidelines range in unlawful reentry cases," *United States v. Pereira*, 465 F.3d 515, 522 (2d Cir. 2006) (noting "the offense level and criminal history category measure different things" and collecting cases (internal quotation marks omitted)).  Accordingly, Petitioner's Guidelines range was correctly calculated.  *See United States v. Donoteo-Reyes*, No. 20-2564, 2022 WL 211100,

---

[11] Petitioner's hodgepodge of other arguments, to the extent they can be construed as raising separate claims, fail for the same reason.  (*See* Supp. Pet. 11–12 (arguing the Court did not consider the sentencing disparity caused by the fourteen-month delay between receiving the Initial *Pimentel* Letter and his sentence); *id.* at 15–19 (asserting the Court did not consider sentencing disparities caused by "systemic racism" or sentences issued to the "wealthy and well connected").)

    To the extent the Supplemental Petition can be construed as asserting a Speedy Trial violation, (*id.* 11–12), the record is clear that Petitioner and his counsel requested multiple adjournments pending the resolution of Petitioner's state case, and each time consented to the exclusion of time under the Speedy Trial Act, (*see* Gov't Supp. Opp. Exs. D–E (status conference transcripts); *see also* Dkt. Nos. 10, 12–14, Dkt. No. 17-CR-65 (requesting adjournments); *see also* Defense Sentencing Submission, Dkt. No. 24 at 2, Dkt. No. 17-CR-65 (noting "we consented to an adjournment of [Petitioner's] plea" for 11 months "so that [Petitioner] could have his day in court in Westchester").)  Thus, there was no Speedy Trial Act violation.  *See United States v. Kourani*, No. 17-CR-417, 2025 WL 604882, at *2 (S.D.N.Y. Feb. 25, 2025) (denying a § 2255 petition because "[n]o Speedy Trial Act violation occurred here since time was repeatedly excluded in the interest of the ends of justice"); *see also United States v. Bramwell*, No. 23-CR-00150, 2025 WL 1924338, at *5 (D. Conn. July 14, 2025) (finding there was no Speedy Trial Act violation where defendant "himself sought continuances of his trial date, resulting in time being excluded from speedy trial calculations").

at *3 (2d Cir. Jan. 25, 2022) (summary order) (rejecting appellants argument that "applying the Guideline[s] means improperly double-counting conduct recognized through criminal history points"); *see also United States v. Fuentes*, 631 F. App'x 76, 77 (2d Cir. 2016) (summary order) (rejecting the same argument and noting "the fact that the offense level was increased by virtue of a previous aggravated felony conviction indicates that 'the prior conviction is a critical part of what makes the current reentry wrongful'" (quoting *United States v. Campbell*, 967 F.2d 20, 25 (2d Cir. 1992))).

Third, "the Guidelines leave it entirely to the district court's discretion whether to impose sentence 'concurrently, partially concurrently, or consecutively to [a] prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.'" *United States v. Coppola*, 671 F.3d 220, 253 (2d Cir. 2012) (quoting U.S.S.G.§ 5G1.3(c)). As the Second Circuit already concluded, the Court had broad discretion to impose a partially consecutive sentence and did so here upon full consideration of the § 3553(a) factors. *Greenland*, 790 F. App'x at 237. Accordingly, the Court denies Petitioner's claim that the imposition of his consecutive sentence was excessive. *See United States v. Broxmeye*, 699 F.3d 265, 289 (2d Cir. 2012) (noting that sentences are only substantively unreasonable if they are so "'shockingly high, shockingly low, or otherwise unsupportable as a matter of law' that allowing them to stand would damage the administration of justice" (quoting *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009))); *see also United States v. Morales*, No. 21-885-CR, 2024 WL 220402, at *9 (2d Cir. Jan. 22, 2024) (summary order) (concluding that a "life sentence followed by a mandatory consecutive sentence of thirty years is not so shockingly high or unsupportable as a matter of law as to be substantively unreasonable"), *cert. denied sub nom. Alvarado v. United States*, 145 S. Ct. 234 (2024).

6.  <u>Date of Entry</u>

Next, Petitioner argues that although he was "found" in the United States in November 2016, he actually entered the United States on 2015 and thus, "current law"—i.e., the 2016 Sentencing Guidelines—should not have applied to his sentence.  (*See* Pet. 8–9; *see also* Pet. Appeal Br. 25–31.)  The mandate rule again bars this claim, as there is no dispute that Petitioner raised this argument on appeal, (*see* Pet. Appeal Br. 25–31), and that it was rejected, *see Greenland*, 790 F. App'x at 236 ("The district court was not, as suggested by [Petitioner], required to consider the Sentencing Guidelines in effect before November 1, 2016 because [Petitioner] was found in the United States close in time to when those Guidelines would have applied.").  Accordingly, this claim is barred.  *Calonge*, 2025 WL 2144689, at *9.

Regardless, it is meritless.  It is well established that a "person who has illegally reentered is 'found in' the United States"—for purposes of § 1326(a)—"when his or her 'presence is discovered,' which . . . mean[s] that the federal authorities possess reliable information as to the alien's whereabouts."  *United States v. Williams*, 733 F.3d 448, 455 (2d Cir. 2013) (quoting *United States v. Whittaker*, 999 F.2d 38, 41–42 (2d Cir. 1993)); *see also United States v. Rivera–Ventura*, 72 F.3d 277, 282 (2d Cir. 1995) ("[T]he offense of being 'found in' the United States in violation of § 1326(a) is not complete until the authorities both discover the illegal alien in the United States and know, or with the exercise of diligence typical of law enforcement authorities could have discovered, the illegality of his presence." (citing first *Whittaker*, 999 F.2d at 41, then *United States v. Gomez*, 38 F.3d 1031, 1037 (8th Cir. 1994))).  It is of no moment that Petitioner entered the United States in 2015, as he was not "found" until November 2016.  (*See* PSR ¶¶ 15–16, 40.)  As the Second Circuit previously concluded, Petitioner's § 1326(a) violation did not occur until November 2016, and thus, the application of

23

the 2016 Guidelines—rather than the 2015 Guidelines—was appropriate. *Greenland*, 790 F.

App'x at 236; *see also Whittaker*, 999 F.2d at 42 (affirming the district court's sentence and

concluding the district court correctly applied the Guidelines in effect when defendant was

"found" in the United States, rather than those in effect when he illegally entered).[12]

       7.  <u>Coerced Plea</u>

Next, Petitioner asserts that he was coerced into accepting his plea because: (1) he

"suffers with [sic] various Medical and Mental issues," which rendered him unable to

"knowingly, intelligently and voluntarily" plead guilty, (*see* Pet. 9–10; Supp. Pet. 5–7); and (2)

he was induced into pleading guilty with the Initial Pimentel Letter, which was later "not

honored," (*see* Supp. Pet. 7–8).  Again, these claims are procedurally defaulted, as they were not

raised on appeal, (*see generally* Pet. Appeal Br.), and Petitioner has not demonstrated cause and

prejudice, *Gomez Ortiz*, 2025 WL 1580922, at *5.  However, these claims also fail on the merits.

"[A] defendant can collaterally attack or appeal a sentence after having waived his right

to appeal in a plea agreement . . . when the waiver was not made knowingly, voluntarily, and

competently."  *Brown v. United States*, No. 14-CR-0659, 2019 WL 3311271, at *7 (S.D.N.Y.

July 17, 2019) (internal quotations omitted).  In determining whether a plea was made

---

[12] Petitioner's ex post facto challenge—i.e., his assertion that "those guidelines imposed a more onerous punishment from the Guidelines in effect when the offense was committed"—similarly fails.  (*See* Supp. Pet. 11.)  "[T]here is an ex post facto violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense."  *United States v. Pereira-Gomez*, 903 F.3d 155, 160 n.6 (2d Cir. 2018) (quoting *Peugh v. United States*, 569 U.S. 530, 533 (2013)).  However, as discussed above, the appropriate Guidelines were the ones in effect when Petitioner was "found"—i.e., the 2016 Guidelines.  Because those same Guidelines were in effect on that date (November 8, 2016) and on the date of Petitioner's sentencing (March 27, 2018), no "more onerous punishment" was committed and thus, there is no ex post facto issue.  *See Whittaker*, 999 F.2d at 40–42 (rejecting argument that the application of the Guidelines when Whittaker was "found" was an ex post facto issue).

knowingly, voluntarily, and competently, "[c]ourts look to whether there were 'lengthy exchanges, largely in question-and-answer form, between the trial court and the petitioner,' and whether '[p]etitioner responded appropriately to all questions and clearly understood the nature of the proceedings.'" *See Jemmott v. Griffin*, No. 16-CV-5126, 2020 WL 2615925, at *9 (E.D.N.Y. May 20, 2020) (quoting first *Oyague v. Artuz*, Nos. 98-CV-6372, 274 F. Supp. 2d 251, 262 (E.D.N.Y. 2003), *aff'd*, 393 F.3d 99 (2d Cir. 2004), then *Lear v. Poole*, 711 F. Supp. 2d 288, 298 (W.D.N.Y. 2010)). In addition, "sworn testimony given during a plea colloquy 'carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made.'" *United States v. Rivernider*, 828 F.3d 91, 105 (2d Cir. 2016) (quoting *United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001)).

As to Petitioner's first argument, Petitioner confirmed under oath at the plea hearing that he had not "been treated within the last three months for any mental illness or for addition to drugs or to alcohol," and had not "either [that day] or at any other time in [his] life, taken or used any drugs, marijuana, alcohol, medication or any other substance which currently affect[ed] [his] ability to think or to understand these proceedings." (Plea Tr. 6:4–13.) The record is also clear that, at multiple points, Petitioner averred under oath that his plea was entered voluntarily and free of coercion. (*See id.* 8:16–19 (confirming that no one "threaten[ed] [Petitioner] or coerce[d] [Petitioner] or promise[d] [Petitioner] anything, in order to get [him] to sign th[e] consent form"); *id.* 8:20–22 (confirming he "sign[ed] the form freely and voluntarily"); *id.* 25:3–6 (confirming no one "threatened [Petitioner] or coerced [Petitioner] or pressured [Petitioner] improperly, in order to get [him] to plead guilty to this charge"); *id.* 25:7–12 (confirming no one "made any promises to [Petitioner] in order to induce [him] to plead guilty" or "made any

specific promise to [Petitioner] about what the sentence of the Court will be").)  Petitioner cannot now "rest a claim on assertions of fact that are contradictory to the statements that he made, under oath, during his plea allocution."  *Brown*, 2019 WL 3311271, at *10 (quoting *Garcia-Leonard v. United States*, 2013 WL 6405176, at *12 (S.D.N.Y. 2013)); *cf. Innocent v. Lee*, No. 19-CV-1496, 2020 WL 4738269, at *4 (E.D.N.Y. Aug. 13, 2020) (rejecting a petitioner's argument on a § 2254 petition that he was coerced into accepting a plea where "any fair review of the minutes of the allocution makes abundantly clear that [the petitioner] acted voluntarily and with knowledge" and where petitioner "also acknowledged, under oath, that he was entering the plea of his own free will").

Petitioner primarily relies on the colloquy between himself and Judge Smith where Petitioner stated he was pleading guilty because he "d[id not] have a choice." (*See* Plea Tr. 33:16–34:6.)  However, after Petitioner expressed these concerns, his attorney advised him he "ha[d] a choice," and could "try the case," and Judge Smith offered Petitioner a chance to delay the proceedings and consider further.  (*Id.* 34:7–17.)  When Petitioner turned down that chance, Judge Smith again confirmed that Petitioner wanted to plead guilty, which he affirmed.  (*See id.* 34:11–23.)  Despite Petitioner's momentary hesitation, the Court concludes that his current claim of coercion is belied by the record and his prior statements under oath.  *See Jemmott*, 2020 WL 2615925, at *8–9 (rejecting a post-conviction challenge that the petitioner's mental state "prevented him from understanding his guilty plea" where "Petitioner participated in a lengthy colloquy with the trial court" and "Petitioner's sworn responses all indicate[d] that he was capable of understanding the guilty plea he entered"); *see also United States v. Haughton*, 764 F. App'x 121, 124 (2d Cir. 2019) (summary order), *as amended* (Apr. 23, 2019) (affirming a judgment of conviction and rejecting a challenge "that the district court did not properly inquire

into his mental state at the time of his plea" where "[t]he record demonstrates that the district court ensured that [the defendant] understood the consequences of his guilty plea and that he was capable of entering an informed plea"); *cf. Poupart v. United States*, No. 15-CV-00538, 2018 WL 1015327, at *9 (D. Conn. Feb. 22, 2018) (rejecting a claim that the petitioner was "coerced and intimidated into pleading guilty," as it was "not supported by any evidence beyond conclusory allegations, and his 'statements made under oath during his plea allocution belie his protestation . . . that his plea was . . . involuntary'" (quoting *Rosenfield v. United States*, 972 F. Supp. 137, 142 (E.D.N.Y. 1997))).[13]

Second, Petitioner claims that his plea waiver is "null and void" because it was induced by the Initial *Pimentel* Letter, which calculated his Guidelines range as 57 to 71 months' imprisonment. (*See* Supp. Pet. 7–8.) However, Petitioner did not plead guilty until after he received the Revised *Pimentel* Letter, which incorporated his October 2017 state conviction and explicitly stated that his Guidelines range would increase to 151 to 188 months' imprisonment if he was sentenced to at least five years for that state conviction. (Rev. *Pimentel* Ltr. 7 & n.4; PSR ¶¶ 4 & nn. 1–2.) Judge Smith discussed the Revised *Pimentel* Letter at the plea hearing, including the revised Guidelines range and potential enhancement after his state sentencing, and Petitioner confirmed that he understood both. (*See* Plea Tr. 14:16–15:22.) Petitioner also confirmed that he understood that those Guideline ranges were not binding on the Government or on this Court in imposing a sentence. (*Id.* 15:17–17:2.) Accordingly, given Petitioner's prior

---

[13] Petitioner also argues that his medical history demonstrates he "has a significant history of extreme emotional disturbance of mental illness, and had been on medication for said issues prior to, and through the entire proceeding." (*See* Supp. Pet. 13–14 (emphasis omitted).) However, based on the colloquies described above and the entirety of Petitioner's plea hearing, the Court concludes that, regardless of any mental illness Petitioner now asserts he had, his plea was entered willingly and voluntarily. *See Jemmott*, 2020 WL 2615925, at *8–9.

statements under oath, the Court is not persuaded that Petitioner's plea waiver was not made knowingly or voluntarily. *See United States v. Tapia-Garcia*, No. 04-CR-694, 2007 WL 2064764, at *4 (S.D.N.Y. July 19, 2007) (rejecting a challenge to a plea made pursuant to a *Pimentel* letter where "the *Pimentel* letter was unequivocal in its nature and purpose and did not purport to contain any agreement or promise to the defendant").[14]

### 8.  Ineffective Assistance of Counsel

Next, Petitioner argues that his counsel was ineffective by failing to argue for various sentencing departures, for "ch[oosing] to forgo" the Initial *Pimentel* plea agreement, and for delaying Petitioner's sentencing until after his state trial and not fully advising him of the consequences of that delay.  (*See* Pet. 10–11; Supp. Pet. 22–23.)  Petitioner also argues that his counsel failed to investigate and discover that he was a U.S. National, that his prior conviction did not constitute an aggravated felony, that he had medical and mental health issues, that he entered the United States under duress, and the date of his actual reentry.  (*See* Supp. Pet. 21–22.)

Claims of ineffective assistance of counsel are evaluated under the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  "First, the [petitioner] must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687.  "Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.*

A petitioner will not meet the first prong based solely on disagreements with counsel's

---

[14]  Petitioner also argues that Judge Smith gave "incorrect information regarding the maximum sentence to which [Petitioner] was exposed," because his "arson conviction was not an aggravated felony" and thus, he was not liable under § 1326(b)(2).  (*See* Supp. Pet. 8–10.) However, as discussed above, it is clear that Petitioner's arson conviction *was* an aggravated felony for purposes of the INA, (supra Section II.B.2), which defense counsel conceded at the plea hearing, (Plea Tr. 2:10–24).

strategy or advice.  Indeed, there is a "strong presumption" that counsel's conduct fell within the

vast spectrum of reasonable assistance, and it is the petitioner's burden to demonstrate "that

counsel's representation was unreasonable under prevailing professional norms and that the

challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986);

*see also Tanveer v. United States*, No. 06-CR-1135, 2019 WL 430262, at *4 (S.D.N.Y. Feb. 4,

2019) (same).  Thus, to satisfy this prong, a petitioner must demonstrate that counsel "made

errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth

Amendment." *Strickland*, 466 U.S. at 687.  In assessing counsel's conduct, "a reviewing court

must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of

counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v.

Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690).

  To satisfy the second prong, "[the petitioner] must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding below would

have been different." *United States v. Caracappa,* 614 F.3d 30, 46 (2d Cir. 2010) (citation

omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the

errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act

or omission of counsel would meet that test, and not every error that conceivably could have

influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at

693 (citation omitted).  "'[P]urely speculative' arguments about the impact of an error do not

establish prejudice." *DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at *4

(S.D.N.Y. Apr. 17, 2013) (alteration in original) (quoting *United States v. Weiss*, 930 F.3d 185,

199 (2d Cir. 1991)).  Moreover, "a court hearing an ineffectiveness claim must consider the

totality of the evidence . . . .  [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Strickland*, 466 U.S. at 695–96.

Petitioner has failed to demonstrate he received ineffective assistance of counsel.  First, he argues that "Defense Counsel after careful and through research could have easily argued for various departure[s] under 5k2.0 Policy Statements," such as "[d]iminished capacity," "[m]ental health," "[c]oerc[ion] and [d]uress," "[m]ilitary," and "[a]ge."  (Pet. 10.)  But, as the Government notes, (*see* Gov't Opp. 30), Petitioner has not shown that he would actually have been entitled to any of these departures, (*see generally* Pet.; Supp. Pet.).  Without more, Petitioner has not shown that his counsel's decision not to seek a downward departure on any of these bases was objectively unreasonable, *cf. Ramirez-Hernandez v. United States*, No. 09-CV-4107, 2012 WL 1838286, at *5 (E.D.N.Y. May 21, 2012) (finding that "[c]ounsel's decision not to seek a downward departure from [a defendant's] mandatory minimum sentence did not fall below an objective standard of reasonableness" where the defendant did not qualify for the safety valve exception or for any reductions under U.S.S.G. § 5K1.1), or that he was prejudiced by his counsel not arguing for any of them, *see Marte v. United States*, No. 02-CR-1490, 2012 WL 2953723, at *8 (S.D.N.Y. July 20, 2012) ("A petitioner cannot show prejudice from a failure to make a motion for downward departure when that motion would be denied." (citing *McEwan v. United States,* 279 F. Supp. 2d 462, 465 (S.D.N.Y. 2003))); *cf. Mosquea v. United States*, No. 09-CV-05546, 2010 WL 1838872, at *5 (S.D.N.Y. Apr. 28, 2010) (finding that the "[p]etitioner

cannot claim that his counsel was ineffective for failing to request a downward departure" where he could not qualify for the specific reduction). [15]

Second, Petitioner has not shown that his counsel was ineffective by "forego[ing]" the Initial *Pimentel* agreement.  (*See* Pet. 10–11.)  As discussed above, Petitioner chose to plead guilty after receiving the Revised *Pimentel* Letter with its enhanced Guidelines range (and potential of being enhanced even further), which Judge Smith took pains to ensure that Petitioner understood.  (*See* supra Section II.B.7.)  Petitioner also affirmed under oath that he understood that a *Pimentel* letter was not binding, (*see* Plea Tr. 13:20–17:2), and that he had discussed the terms with his counsel, (*id.* 9:14–20).  Further, Petitioner has not argued that his counsel failed to provide him with or explain either *Pimentel* Letter, nor that he would have rejected a guilty plea unless the Initial *Pimentel* Letter stood.  (*See generally* Pet.; Supp. Pet.)  Accordingly, Petitioner has not shown that his counsel's actions fell below an objective standard of reasonableness.  *Cf. Gonzalez v. United States*, No. 17-CV-1093, 2019 WL 3408886, at *4 (S.D.N.Y. July 29, 2019) (finding petitioner did not "satisfy either *Strickland* prong" where "he offer[ed] nothing to show that his counsel's representation fell below an objective standard of reasonableness or that his counsel misled him," and where, during petitioner's plea allocution, he "stated that he was familiar with and understood the terms of his plea agreement" and "also affirmed that he

---

[15] Moreover, it is clear from the record that defense counsel *did* seek a substantially below Guidelines sentence of "60 months concurrent to the state sentence" citing, in part, Petitioner's age, (*see* Sentencing Tr. 14:2–15:2), thus undercutting Petitioner's claim, *see Velazquez v. United States*, No. 19-CR-116, 2023 WL 8432858, at *5 (S.D.N.Y. Dec. 5, 2023) (denying an ineffective assistance claim where "[t]he Court considered defense counsel's request for a downward departure, and denied it, taking into account both Sentencing Guideline policy, and the factors listed in 18 U.S.C. § 3553(a)"); *Kapelioujnyi v. United States,* 779 F. Supp. 2d 250, 256 (E.D.N.Y. 2009) ("Petitioner cannot show prejudice as a result of counsel's conduct because Petitioner's counsel did, in fact, request a sentence below the guideline range, although counsel did not frame his request as a motion for a 'downward departure.'"), *aff'd*, 422 F. App'x 25 (2d Cir. 2011).

discussed the charges with [counsel] and that he was satisfied with the representation and advice of counsel"); *cf. Norville v. United States*, 151 F. Supp. 3d 329, 337–38 (S.D.N.Y. 2015) (denying an ineffective assistance claim where counsel "requested and received a *Pimentel* letter," negotiated a below guidelines range, and "fully informed" the defendant of the conditions of the plea agreement"); *Rodriguez v. United States*, No. 09-CR-58, 2013 WL 3388223, at *7 (S.D.N.Y. July 8, 2013) ("[The defendant] can demonstrate neither deficient performance nor prejudice with regard to his counsel's alleged failure to negotiate a plea agreement or show him [the Government]'s *Pimentel* letter" as "counsel's conduct fell within the acceptable range of discretion afforded him under *Strickland*.").

Third, Petitioner has not shown that counsel was ineffective based on her allegedly "unilateral decision" to delay Petitioner's sentencing pending his state trial. (*See* Supp. Pet. 22–23.) At sentencing, defense counsel explained that:

> there was no question that he had committed the crime of illegal re-entry because he was here. And we talked at length about whether or not we should go ahead and get the plea in and get him sentenced on the illegal re-entry prior to his going to trial. And, from the beginning, [Petitioner] explained the crime to me, explained how he felt the whole thing went down. I had repeated conversations with his state attorneys who tried the case. They believed they had a very good chance at trial. Why is that significant? It's significant because the decision on whether to plead prior and be sentenced prior to a state trial swung the guidelines considerably. . . . Had I encouraged him or had we determined that it would be best for him to get sentenced on this first, he would be looking at a much lower guideline.

(Sentencing Tr. 11:18–12:7.) In other words, it is clear that the decision to delay the sentence was strategic and made in full consultation with Petitioner, and "[i]t is well settled that a 'strategic decision does not constitute ineffective assistance of counsel.'" *Daugerdas v. United States*, No. 09-CR-581, 2021 WL 603068, at *3 (S.D.N.Y. Feb. 16, 2021) (quoting *Jiang v. Mukasey*, 522 F.3d 266, 270 (2d Cir. 2008)). That the calculated risk did not pay off for Petitioner does not render his counsel's assistance ineffective. *See*

*Brown*, 2019 WL 3311271, at *10 ("A counsel is not ineffective merely because a sentencing prediction turns out to be wrong."); *see also Parrilla v. United States*, No. 13-CR-360, 2021 WL 4066021, at *4 (S.D.N.Y. Sept. 7, 2021) ("Simple disagreement with counsel's chosen strategy, especially with the benefit of hindsight, is insufficient to support an ineffective assistance of counsel claim."); *Gonzalez v. United States*, No. 17-CV-1093, 2019 WL 3408886, at *4 (S.D.N.Y. July 29, 2019) ("[C]ourts are instructed not to second-guess reasonable professional judgments and impose on counsel a duty to raise every colorable claim," and thus, "this Court 'will not second-guess trial counsel's defense strategy simply because the chosen strategy . . . failed." (quoting first *Parks v. Sheahan*, 104 F. Supp. 3d 271, 288 (E.D.N.Y. 2015), then *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987))). [16]

Finally, Petitioner cannot demonstrate that his counsel was ineffective due to "her failure to conduct the investigation she was bound to conduct." (*See* Supp. Pet. 21.) Petitioner asserts that his counsel failed "to develop Petitioner's best and/or only defense[s]"—i.e., that he "is a United States National," that his arson conviction did not qualify as an aggravated felony, and that he had "an innocent explanation for his presence into the United States," namely, duress. (*See* Supp. Pet. 25–26.) But, as discussed above, there is no evidence to support Petitioner's claim that he is or ever was naturalized, (*see* supra Section II.B.1), his conviction plainly qualified as an aggravated felony, (*see* supra Section II.B.2), and the record provides no basis for Petitioner's claim of duress, (*see* Gov't Supp. Opp. Ex. D (Dkt. No. 10-4, Dkt No. 20-CV-8303)

---

[16] Moreover, although Petitioner asserts that he "was not adequately advised of the 'legal consequences' of what could/would transpire[] in the event [he] did not prevail on his State claim," (Supp. Pet. 23), that claim is belied by the record and by Petitioner's own affirmations at the plea hearing, (*see* supra Sections I.A.3 and II.B.7).

(Petitioner's sentencing letters detailing his non-duress reasons for returning to the United

States)).  If counsel had raised these arguments, they very likely would have been rejected; thus,

"counsel's 'failure to make a meritless argument does not rise to the level of ineffective

assistance.'" *United States v. Herron*, No. 10-CR-615, 2025 WL 821883, at *9 (E.D.N.Y. Mar.

14, 2025) (quoting *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995)); *Knowles v. United

States*, No. 11-CR-630, 2022 WL 999078, at *7 (S.D.N.Y. Mar. 30, 2022) (failure to baselessly

object to the admission of relevant evidence was not ineffective assistance (citing *Kirsh*, 54 F.3d

at 1071)); *cf. Marte*, 2012 WL 2953723, at *7 (failure to object to a PSR was not ineffective

assistance when the objection had no merit).

Even if the Court could determine that counsel's failure to investigate was

constitutionally defective, Petitioner offers no credible explanation that a better investigation

would have led to a lower sentence or dismissal of the charges.  Accordingly, Petitioner has not

satisfied the second prong of his ineffective assistance claim.  *See Harris v. Great Meadow Corr.

Facility*, No. 17-CV-00760, 2020 WL 1000066, at *9 (E.D.N.Y. Mar. 2, 2020) ("[U]ndetailed

and unsubstantiated assertions that counsel failed to conduct a proper investigation have

consistently been held insufficient to satisfy either *Strickland* prong." (quotation omitted)); *see

also Sica v. United States*, No. 14-CR-462, 2019 WL 6341300, at *3 (S.D.N.Y. Nov. 26, 2019)

(denying ineffective assistance claim where "[p]etitioner's allegation of insufficient investigation

[wa]s not only conclusory, but [wa]s refuted by the record" and where "he ha[d] not shown that

any additional investigation would have been helpful to his cause or how he would have been

better off going to trial" (internal citations omitted)); *Alvarez v. United States*, No. 08-CR-1192,

2019 WL 1428350, at *7 (S.D.N.Y. Mar. 29, 2019) (rejecting an ineffective assistance claim

where petitioner could not explain "that a better investigation would have led [him] to elect to go

to trial instead of pleading guilty," given that "[t]he Government proffer[ed] . . . that it had a plethora of evidence against Petitioner").[17]

III.  <u>Conclusion</u>

For the foregoing reasons, the Court concludes that a hearing is not warranted and the Petitions are dismissed with prejudice.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of Court is respectfully directed to enter judgment for the Government in Case No. 20-CV-8303, close Case No. 20-CV-8303, and mail a copy of this Opinion to Petitioner.

SO ORDERED.

Dated:    September 4, 2025
         White Plains, New York

_____
      KENNETH M. KARAS
     United States District Judge

---

[17] Petitioner's other conclusory arguments that his counsel was ineffective—i.e., for not presenting evidence of Petitioner's good behavior in jail and enrollment in the Resolve to Stop Violence program, (*see* Supp. Pet. 27), and for not investigating and presenting a defense based on Petitioner's alleged mental health issues, (*see id.* at 14)—fail for the same reasons.